Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 2083 | **DATE** | 6/14/2000 |
| **CASE TITLE** | Flanagan, et al. Vs. Reno, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion for summary judgment is granted. Ruling set for 6/23/00 is vacated. Any pending motion in this case is terminated as moot. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 4 number of notices | Document Number |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | JUN 15 2000 date docketed | 76 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | docketing deputy initials | |
| ✓ | Mail AO 450 form. | 6/14/2000 date mailed notice | |
| | Copy to judge/magistrate judge. | | |
| MPJ | courtroom deputy's initials | Date/time received in central Clerk's Office | MPJ mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL FLANAGAN, NORBERT )
KUKSTA, MELVIN SCHABILION, SAUL )
WEINSTEIN, and FRANCIS E. )
WHITE, )
        Plaintiffs, )
)
v. )
) No. 97 C 2083
)
JANET RENO, Attorney General of )
the United States, and **DRUG** )
**ENFORCEMENT AGENCY**, )
)
        Defendants. )
)

**DOCKETED**

**JUN 1 5 2000**

## MEMORANDUM OPINION AND ORDER

The plaintiffs here claim that they were subject to retaliation for complaining that they were white male victims of political correctness. They are present and former federal drug agents (the "DEA agents"), originally based in the Chicago, Illinois, office of the Drug Enforcement Agency ("DEA"), who gave DEA-sponsored training seminars in drug enforcement in the early 1990s. Three women police officer participants in these seminars filed a highly publicized lawsuit, alleging that the DEA agents engaged in sexual harassment during these sessions, that put the agency in an unflattering light. The DEA agents were put on leave, transferred, and subjected to various other actions to which they

76

objected. They filed administrative complaints, alleging that the DEA's investigation of the charges was discriminatory against them as white men, that women or minorities who had behaved as they did would not have been treated as they were treated. In the present lawsuit, they allege that the job actions to which they were subjected were really retaliation for filing these complaints. The defendants move for summary judgment, and I grant the motion.

I.

The plaintiffs are or were "well-regarded and highly decorated federal drug agents." In the early 1990s, they participated in an "incredibly successful" DEA training program for military and local enforcement agents to help these officers understand the dangers involved in drug enforcement and teach them how to gather evidence in drug cases. The DEA agents gave or supervised a number of such training seminars from 1989 to 1995. On April 5, 1995, three women police officers from Madison, Wisconsin, who had participated in their seminars, filed a lawsuit, in which they alleged, among other things, that from 1991 to 1995 the DEA agents:

> (1) gave presentations that were "riddled with talk . . . that glorified aggressive sexual acts by men against women, intermixed with comments glorifying violence and demeaning women in general";
>
> (2) opened each seminar by promising male participants that: "[w]hen you men get home you are going to fuck like you've

never fucked before. Tell your wife to wear something cheap or nothing at all because you are just going to rip it off. Get the kids out of the house 'cause it's gonna be a brutal fucking assault";

(3) interspersed instructional slides with slides of nude or scantily clad females, referred to women in attendance as "hen," "babe," "little girl"; to other women as "bitches"; to black women as "brown sugar"; to Attorney General Janet Reno as "a fuckin' dyke" and a "bitch"; and fantasized out loud about Attorney General Reno and First Lady Hilary Rodham Clinton "getting together and doing other";

(4) described the objective of drug surveillance as "get[ting] laid," "get[ting] her drunk and find[ing] a hotel";

(5) boasted about how DEA agents get "horny" unless they can kill people on a regular basis; about having shot one person 16 times; discussed how the human head looks when hit with a rifle round; talked about how blowing up explosives "will give you a chubby" [an erection], and about making sure that a suspect weighed "ten pounds more" after being shot;

(6) grabbed their own genitals for emphasis, referring to them as "chubby," "woody,' "johnson," "pecker," "dick," "rocks";

(7) directed sexual comments to specific women participants, one of them saying, e.g., to a women lying down on a firing range, "I'm getting a hard on!", then grabbing his genitals; inviting a woman onstage for a chemical demonstration because "it was more interesting watching a pretty girl"; made references to her "jiggling" while having her turn sideways so that her breasts could more clearly seen; telling a participant to "put your hot little hands on the bag [used in the demonstration], give it a good squeeze, you'll get it going."

Complaint in *Markham v. White*, No. 95 C. 2065, at 3-6 (*filed in N.D. Ill. Apr. 5, 1995*). The DEA agents admit that they may have been "politically 'incorrect[]."" They say, however, that "drug

-3-

enforcement habitually overshadows any notion of being politically 'correct' . . . . Salty language and four letter words often comprise the essential *sine qua non*, necessary to controlling the dangerous situations encountered while enforcing drug laws." They claim that there is a tension between "political 'correctness' and the desire to assist in the saving of the lives of those thousands of dedicated men and women who hope to stem the flow of dangerous drugs . . . ." The DEA agents do not, however, contend that giving training seminars to law enforcement officers is one of the dangerous situations that might justify or excuse "salty language."

Complaints were made about the seminars in 1994 even before the filing of the *Markham* lawsuit, leading to an internal investigation. Agent Weinstein made an informal charge about the fact of the investigation and the way it was conducted, alleging discrimination because he was a white male, no later than mid-March 1995, although the exact date is unclear. There is no evidence that the other DEA agents took protected action before April 1995.

The *Markham* lawsuit created public embarrassment for the DEA. Madison, Wisconsin, TV news reported the allegations on the evening news on April 4, 1995. The AP wire service brought the allegations to the attention of the national media on April 5. On April 6, stories appeared in the *BNA Daily Labor Report*, the *Chicago Sun-*

*Times*, the Madison *State Journal* and *Capital Times*, and as far away as Lakeland, Florida. The women officers' charges were recounted in lurid detail in most of the stories.[1] Virtually all of the most shocking and graphic language and conduct was quoted and described *in extenso*. On April 7, 1995, the DEA agents were placed on administrative leave with pay by Retha M. Fulmore, DEA Deputy Assistant Administrator of Personnel, at the recommendation of then Deputy Assistant Administrator Thomas Byrne. There is debate about whether then DEA Administrator Thomas Constantine was involved in this decision or others connected with the affair. The DEA agents were required to hand over their guns, badges, and credentials while on leave.

On April 10, 1995, DEA Deputy Administrator Stephen Greene decided that four of the DEA agents should be transferred out of Chicago: Melvin Shabilion to Atlanta, Georgia; Saul Weinstein to Newark, New Jersey; Nobert Kuksta to St. Louis, Missouri; and Michael Flanagan to McAllen, Texas. Greene denied that the transfers were disciplinary. He testified that they were made for "the good of the individuals involved and the good of the agency";

---

[1] Moreover, *U.S. News and World Report* planned to publish an article discussing the DEA agent's language and conduct in its issue of June 5, 1995, and interviewed DEA officials about the allegations.

-5-

the DEA agents dispute this. The DEA agents were given 45 days to report to their new duty stations instead of the usual or former 90 days. They filed their first series of official complaints on April 11, 1995, following these up with further complaints on May 8 or 9, and then more complaints in late May and June.

As a result of the DEA's initial investigation into the police officers' charges, the agency proposed to terminate Francis White at Green's recommendation, but no final decision was reached before Agent White retired on May 1, 1995. Agent White claims that he was constructively discharged, as does Agent Weinstein, who resigned from the DEA in October 1995. Agent Flanagan received a letter of reprimand, and he claims he failed to receive certain promotions, including one to the Brownsville, Texas, Resident Office, because of his protected activity. Some of the other DEA agents have other incidental complaints as well. This lawsuit followed.

II.

The standards for summary judgment are well known and need not be recited here. To make out an indirect case for illegal retaliation, the plaintiffs must show that (1) they engaged in activity protected under Title VII; (2) they suffered adverse employment action; and (3) a causal connection exists between the

adverse action and their participation in the protected activity. *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir. 1995). If this prima facie case is made out, defendant employers must rebut with a showing that they acted from nondiscriminatory reasons, which the plaintiffs can defeat by producing evidence that the proffered reasons were pretextual. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Here, the defendants do not dispute that the DEA agents engaged in protected action in filing the complaints. They do argue that the DEA agents did not suffer adverse employment action. An adverse action occurs when an employee is fired or demoted, suffers a decrease in benefits or pay, or is given a significantly lesser job. *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996). Not every unwelcome employment action qualifies as an adverse action: negative reviews, a change in job title, an increased distance to travel to work, or a lateral transfer do not, by themselves, qualify. *Id.* The DEA agents do not adequately respond to the defendants' arguments that being placed on administrative leave with pay is not adverse enough. They merely assert that this is adverse action. The argument is therefore

waived.[2] *Koelsch*, 46 F.3d at 708.

Whether or not being placed on administrative leave is adverse action, the DEA agents also argue that transfers to far flung places constitute adverse action. I understand the Seventh Circuit's admonition that mere "lateral transfers" are not adverse action to apply within a reasonably compact geographical location. The case on which the *Koelsch* court relies for that proposition, *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir. 1989), concerned travel within a single school district, *see id.* at 885. Being uprooted from one's community in Chicago and dispatched on 45 days notice many hundreds of miles away to Newark, McAllen, Atlanta, or St. Louis, whatever the charms or advantages of those communities, is not a "lateral transfer." In the circumstances, it is adverse employment action.

The defendants argue that it would have been adverse action actually to have terminated Agent White, but that he was not disciplined at all because he resigned. Fair enough, but their answer to his claim that he was constructively terminated is that

---

[2] A long term administrative leave, which would deprive an employee of work, any chance to advance, and other benefits, probably could constitute adverse employment action. It is less clear at what point this would become an adverse action.

he must show that the defendants made his workplace intolerable, *Drake v. Minnesota Mining & Manufacturing*, 134 F.3d 878, 886 (7th Cir. 1998), and that a complaining employee is ordinarily expected to stay and fight. *Id.* However, since the employee's termination was actually proposed, Agent White's is not the ordinary case, and a reasonable jury might believe that his workplace had become so intolerable that a reasonable person would have had to quit because of unlawful retaliation. Other things being equal, this would be a material issue of fact. Agent Weinstein's claim that he was constructively discharged, however, is not supported. A transfer to Newark does not count as employment conditions so extreme and intolerable that any reasonable person would have to quit.

According to the defendants, Agent Flanagan's reprimand was not adverse action because counseling letters or negative evaluations have been held not to be such action. But the reprimand was not a counseling letter or a mere negative evaluation. The DEA admits that it was disciplinary in nature, and if that is not adverse, what is? Agent Flanagan fails to make out a plausible case, however, that he was denied any promotions or transfers that he applied for, or indeed to offer any evidence, even his own sworn testimony, that he actually applied for any promotions or transfers

after he was posted to McAllen. The DEA agents' other allegations of adverse job action are frivolous.

The DEA agents' causation argument is based on the principle that a "telling temporal sequence" is enough for a causal connection. *Davidson v. Midelforth Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). First, they contend that on March 17, 1995, then DEA Administrator Constantine was "personally informed that the five Plaintiffs had filed informal . . . complaints," and they were placed on administrative leave less than three weeks later. But the evidence they cite, DEA Agent James Morgan's affidavit, supports only the claim that Constantine had been advised only of Agent Weinstein's informal discrimination charges. It specifically states that Constantine had not been advised of Agent White's informal charges, and it says nothing about the others. Moreover, the DEA agents bring forward no evidence contradicting the defendants' sworn testimony that Constantine had nothing to do with the challenged decisions. Finally, as explained, the DEA agents do not show that administrative leave as such is adverse action, so there would be nothing in the temporal sequence to connect to Constantine's knowledge of Agent Weinstein's complaint.

Second, the DEA agents who transferred testify that they were transferred "within hours" of notifying an agency EEO Counselor on April 10, 1995, that they intended to file formal charges. There is dispute about whether Constantine was involved in this decision, and the DEA agents' claim that he was involved rests on hearsay, but his involvement is not necessary for the causation argument. Because the transfers were adverse action in this context, the temporal sequence is established, and the causation element is satisfied for the transferred DEA agents.

The real issue in the case is whether the defendants' proffered reason for the transfers and other adverse action was legitimate or pretextual. It would not be retaliatory or otherwise illegal to transfer, reprimand, and even fire employees who had embarrassed the agency in the manner described. Indeed, if the agency had determined that the Madison policewomen's charges were true, the DEA agents arguably should have been disciplined regardless of whether the agency was publicly embarrassed. So the DEA agents must bring forward enough evidence to persuade a rational jury that the proffered reason is pretextual. Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action. *Wolf v.*

*Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir. 1996). A plaintiff can prove the incredibility of the employer's proffered reasons, and thereby demonstrate pretext, by showing that the employer's proffered reasons are (1) factually baseless, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the adverse action. *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997).

The DEA agents make no effort to show that the reason was factually baseless--they admit that they behaved "politically incorrectly," leading to a lawsuit and public embarrassment for the agency. They do not deny that this would be sufficient to motivate transfers, reprimands, or even termination. They rest their case on the argument that the proffered reason was not the actual reason. Although the DEA agents say that "suggestions to the contrary border somewhere between the absurd and [the] inane," they do not begin to show this.

The DEA agents assert, with no evidentiary support, that they were treated differently, but they do not even say from whom or how. They say that the timing of the transfers is "suspicious," but they were transferred the day after the DEA was depicted as a serial sexual harasser in the national media due their behavior.

-12-

The DEA agents say that the image problems had been "forestalled" by placing them on administrative leave; but even if so, that is not a reason to doubt that they were transferred because of the embarrassment they had caused. They claim that it is "suspicious" that the posts were far apart and located inconveniently far from Chicago, where the *Markham* lawsuit is pending, but it is not surprising that posts available on short notice would be widely dispersed. They argue that it is "fishy" that the government refused to defend the civil case against them, but that is irrelevant to the motivation for the adverse job actions. Finally, the DEA agents allege that various problems arose with the transfers, *e.g.*, that there was no post in Newark for Agent Weinstein and that McAllen was bad for Agent Flanagan's children, but problems arise with any transfer. This does not bear on whether the DEA transferred them because of their embarrassing behavior.

An employer has the right to discipline employees that disgrace it with shameful and, if the women officers' allegations can be proved, quite possibly illegal conduct. Exercise of that right is not retaliation. The DEA agents fail to satisfy their burden that the defendants acted for other than the entirely

legitimate reasons stated. The defendants' motion for summary judgment is therefore GRANTED, terminating this case.

ENTER ORDER:

*signature*

**Elaine E. Bucklo**
United States District Judge

Dated: June 13, 2000

Copies are being mailed to:

David P. Schippers
Schippers & Bailey
20 N. Clark Street, #3600
Chicago, IL 60602

Allan A. Ackerman
Attorney at Law
2000 N. Clifton
Chicago, IL 60614

Attorneys for Plaintiffs

Thomas P. Walsh
Assistant U.S. Attorney
219 S. Dearborn Street, 5th Fl.
Chicago, IL 60604

Lois B. Osler, Attorney
Department of Justice, Civil Div.
Federal Programs Branch
901 E Street, N.W., Room 1042
Washington, D.C. 20530

Attorneys for Defendants